Eddy's Case.

In the matter of the propounding for probate of paper writings purporting to be the last will and testament, and codicil thereto, of LUCY H. EDDY, deceased, late of Rahway, in the county of Union.

1. Mere forgetfulness of recent events, in a testatrix eighty-three years old, is no evidence of incapacity to make a will.

2. The influence of kind and faithful service by an attendant for many years, is not *undue*, and will not invalidate a bequest to such attendant.

*Mr. B. A. Vail, Mr. J. H. Stone* and *Mr. C. H. Hartshorne*, for the executors.

*Mr. E. S. Savage, Mr. W. H. Vredenburgh* and *Mr. B. Williamson*, for the caveators.

THE ORDINARY.

Lucy H. Eddy died in the city of Rahway, in 1879, leaving a paper purporting to be her last will and testament, dated January 19th, 1875, and another one, purporting to be a codicil thereto, dated September 5th, 1876. The admission of these instruments to probate is resisted, on the ground that she was not possessed of testamentary capacity at the time of making them, and, if she was, that they were the result of undue influence on the part of Lucy E. Chapman, who lived with her for many years, and to whom a legacy of $15,000 is given in the will, with an interest in the residuum of the estate.

The testatrix was a maiden lady, of the religious society of Friends. She was, when she executed the testamentary instruments in question, in old age. She was in the eighty-third year of her age when she executed the will. She was the daughter of Thomas Eddy, deceased, formerly of the city of New York, a man distinguished in his day for his public spirit and philanthropy, and occupying a

high position in society, and numbering among his friends and acquaintances some of the most celebrated people. The testatrix appears to have inherited his strong mental qualities and convictions of duty. She was well educated, and seems to have pursued her mental cultivation to excellent purpose. It is urged, however, on the part of the opponents of the will, that when the will in question was made, her mind had become so enfeebled by age as to render her entirely incompetent to transact any business, and to deprive her of testamentary capacity. Her estate was large.

The instruments in question were executed with due legal formalities. The testatrix had made two previous wills, one in 1861, and another in 1867, to which latter she made two codicils, one in 1870 and the other in 1874. Up to 1873, or thereabouts, she lived in a house which she owned on Irving street, in Rahway. In or about that year she bought some lots from Jacob R. Shotwell, in another part of the town, and built a house on part of it, which she occupied until her death. From about 1855 till her death, Lucy E. Chapman, the legatee before mentioned, lived with her, and, for many years before the death of the testatrix, was her companion and attendant. The testatrix was of feeble frame, and required such companionship and attention. Miss Chapman took the place in that respect of a niece of the testatrix, who died while living with her. The title to the land bought from Mr. Shotwell, for what became the homestead, and some land bought in connection therewith, was taken in the names of both the testatrix and Miss Chapman, and it was intended to create, by the deeds, a joint tenancy. The property, as well the building as the land, was paid for by the testatrix.

It is not necessary to discuss the testimony (which is very voluminous) at any great length. A mere reference to parts of it will suffice. To speak briefly of that of the witnesses called for the caveators:

Ellen Mahoney, who was one of the witnesses to the codicil, and who lived many years with the testatrix as a ser-

vant, testifies that the testatrix's memory was impaired.
She also says that the testatrix came out into the kitchen
after her to witness the codicil, and told her to come into
the library for a few minutes, that she wanted her, and she
testifies that when she was called by the testatrix to witness
the execution of the codicil, the testatrix appeared to under-
stand the business she was engaged in, and she says that
she supposed then, and now believes, that the testatrix knew
what the codicil was about.

Margaret Studer was also a servant for the testatrix.   She
testifies that the testatrix became forgetful, and would laugh
about it herself; but, at the same time, she testifies that the
testatrix knew what was going on about her, and knew her
relations, and kept up her interest in them.   She says the
testatrix was very nice, and very saving, and very lady-like,
and very good, in every way.

George Williams testifies that he was acquainted with the
testatrix from June, 1875.   He says she was forgetful of
recent events, but that old events, apparently, seemed to be
present to her mind all the time, and her conversation was
almost entirely of them and of old people; that she had
great family pride—was proud of her father and of his con-
nections; that she seemed to have clear ideas of what she
read in the classics and histories; was a well-read woman,
and seemed to be all right when conversing upon those
subjects. . He says the great weakness in her mental powers
was a weakness of memory in connection with things of
modern date.   He also says, that about matters not involv-
ing her memory, she seemed to know what she was about.

Esek H. Williams, his brother, testifies, in like manner,
that he observed no weakness in her mind beyond a weak-
ness of memory as to recent matters.   In his direct examina-
tion he was asked, whether, in his opinion, she was capable
of disposing of her property by will, and he declined to say
that he thought her unfit, though he says he thinks it
requires a pretty clear mind to make a valid will.   He
admits that he never had reason to doubt that she would

always, when spoken to, give a reply which showed that she understood the question; and, he adds, "She certainly could answer a question, at all events."

Mr. McBurney, a lawyer, who saw the testatrix in 1873, at Cornwall-on-the-Hudson, where she was passing the summer, and, again, about two years subsequently, at Rahway, expresses his opinion that she was, on each occasion, incompetent to transact business; but it appears that he, on each visit, obtained her signature, which he witnessed, to a paper relinquishing her right to money in the court of of chancery, and consenting that it be paid over to her great-niece Mrs. Pollock, and the relinquishment and consent so obtained were acted upon by the court. He says she knew what the paper was which she signed in 1873 when she signed it, and it appears, by his testimony, that when he obtained her signature to the like paper, two years afterwards, he merely told her what it was by saying that it was similar to the one which she had signed at Cornwall.

Mrs. Pollock, one of the caveators, while she testifies that the testatrix had become forgetful, at the same time distinctly testifies that she knew who her relations were. To a question, whether the testatrix recognized her relationship to her, she replied, "She certainly did;" and adds, in answer to another question, that the testatrix seemed to know more about who was her nearest relation than Miss Chapman did.

Mrs. Jane O. Hunt, and Mrs. Mary L. Adriance, and Annie Williams, testify to the testatrix's failure of memory. The former, however, gives an instance in which the testatrix rebuked Miss Chapman for some expressions she had made in regard to the family of Robert Shipley, on one of the last occasions on which the witness saw her.

Mrs. Amelia L. Williams testifies to what occurred at the time of a call she made on the testatrix in the spring of 1876. She says that she did not see enough of the testatrix, and was not well enough acquainted with her, to understand the strength of her mind, further than to notice that she was

very forgetful.    She adds, that the testatrix, on that occasion, recognized her and her husband, however.    She also says that she considered the testatrix a woman of very strong mind, until she became forgetful.

Annie Williams, a witness before mentioned, says the testatrix was a person of considerable force of character, and quite an intellectual woman, but she says she thinks that, apart from the forgetfulness, her mind did not keep up the same vigor.    She further says that the testatrix would have "bright streaks, and would then converse as clearly as ever."

These witnesses establish the fact that the testatrix, in the latter part of her life, gave evidence of the usual concomitant of age (the absence of which would be surprising), a loss of memory as to recent occurrences, but their testimony does not establish a want of knowledge, comprehension or appreciation on her part of her circumstances, nor that she did not know what estate she had, or who her relations were, or appreciate their claims upon her, or know what she was doing when she made the will and codicil in question.    On the other hand (to speak of the witnesses called for the proponents), Messrs. Vail and Horton, the former of whom was a witness to the will, and the latter to both will and codicil, testify clearly to the possession by the testatrix of testamentary capacity.    The testimony of Jacob R. Shotwell and Mrs. Shotwell his wife, and of Elizabeth Robinson and Judge Bowne, of Helen Rodgers, Hetty L. Lewis, Emily H. Rodgers, Sophia H. Hosack, Lucy E. Chapman, Rev. Mr. Van Antwerp, Samuel W. Clarke and William H. Hartshorne, and that of Doctors Oakley, Selover and James, fully establish her testamentary capacity.

Mr. Vail was called as a witness at the beginning of the testimony.    He testified that he drew the will of 1875; that from what Judge Bowne said to him, he went to see the testatrix the next day, as he believes, and saw her in her library; that she handed him an old will (which he thinks she got from a drawer), that had been executed

some years before (it was the will of 1867), and went over
it with him, and directed him what changes to make in the
will he was to draw, taking the old will as the basis.  He
says he went away, and, after having drawn the will,
returned the next day and saw her, and read it over to her,
and she then executed it, after an alteration or two in the
names of one or more of the legatees.  He further says
that, after the will had been executed, she suggested that
he should keep all the papers, including the new will, and
he put them together and sealed them up, and kept them
till her death.  Mr. Vail received his instructions for the
codicil to the will, also, from her in person.  He says he
went to see her, and she told him what changes she wanted
to make.

Not only is her testamentary capacity established, but,
from the circumstances testified to by some of the propo-
nents' witnesses, the testatrix appears to have maintained
her mental vigor up to her death to a most unusual extent,
Messrs. Shotwell and Bowne testifying to facts which show
business ability on her part of no ordinary character.  The
schedule or list made for her, at her request, by Judge
Bowne, of the legacies given by her will of 1867, for her
guidance in making a new will, marked as it is by the
evidence of her careful consideration, is evidence of her
capacity.  At the names of some of the legatees there are
pencil memoranda made by her, as follows:  At the name
of Fanny Kibbe, "*Nee* Gillingham, daughter of L. L. E.,"
indicating the parentage of that legatee; at the name of
Lucy Hartshorne, the words "daughter of Sam'l H.," and
at that of Mary Harvey, to whom she gave $1,000 by the
will of 1867, but who had died since that time, the words
"two daughters."  In the will of 1875, it may be remarked
here, she gives to Mary and Rebecca Harvey, daughters of
Mary Harvey, each $1,000.  Up to 1870, she kept the run
of her bank account in her check-book, herself.  In 1876,
Judge Bowne prepared and gave to her, for her examina-

ation at pleasure, a book, containing a statement of her income and its sources.

About 1876, Rev. Mr. Van Antwerp, a clergyman of the Protestant Episcopal Church, settled in Rahway, being at her house, had a conversation with her, in which he incidentally referred to a certain translation of Virgil into English, and he says she asked him a number of very intelligent questions about it, and identified, as he expresses it, the author's name, and remarked that she had not seen the edition to which he referred, and showed, as he says, such an intelligent appreciation of the subject as quite surprised him. He also speaks of another conversation which he had with her, in the winter of 1878 and 1879 (he was acquainted with her from 1874), in reference to an illustration in a periodical, in which her powers of observation were exhibited to such a degree as to attract his notice. Other witnesses speak of her knowledge of and interest in art and artists, and of her knowledge of, and ready and apt reference to, historical incidents.

These things show that she possessed her mental faculties to an extraordinary degree in her advanced age and up to the time of her death, which was five years after the will was made, and four years after the execution of the codicil. In her will she appears to have been constant in her attachment to her family. Every one of her numerous legatees and devisees to whom gifts are given for their own benefit, is a descendant of either her paternal or maternal grandfather. In her gifts to charities in the will, she confines herself to objects which would naturally challenge and engage her interest, either as matters of denominational concern or mere philanthropy, without regard to sect. They are: the Indiana Yearly Meeting of the Society of Friends, for the use and benefit of the boarding-school fund, $1,000; Woman's Monthly Meeting of the Society of Friends, of Rahway and Plainfield, $250; the Indiana Yearly Meeting of the Society of Friends, for the use and benefit of the Indians, $500; the Western Yearly Meeting

46

in Iowa of the Society of Friends, for the purpose of education, $1,000; the Prison Association of New York, $500; the New York Infirmary for Women and Children, $500, and the New York Juvenile Asylum, $500.

The will and codicil are in accordance with her views long cherished and long previously acted upon, and in accordance, also, it may be remarked, with reasonable expectations, under the circumstances. Her gifts to Lucy E. Chapman are evidently attributable to her own sense of duty. Miss Chapman appears to have devoted herself to her from 1855, when the former was about fifteen years old, till the testatrix's death, in 1879, a period of about twenty-four years, and, from 1868 or 1869, she always occupied the same bed with her and never left her for even a single night. It is not surprising that, under the circumstances as they appear in the evidence, the testatrix should have given to her what she intended to give her by the conveyance of the homestead and the land bought in connection with it, and the gifts which, by the will, she has bestowed. The influence of kind and faithful service and attention is legitimate, and the testimony does not establish any other.

It was urged, on the hearing, that the confidence which the testatrix reposed in Judge Bowne and Mr. Shotwell, in regard to the building of her house for her, and her apparent inattention to the fact that much more money was expended on the property than was at first contemplated, is evidence of the want of that capacity which is requisite to the making of a will, but in all that matter there is apparent only the confidence and reliance which a person in her sitution might well repose in competent business men in whom she placed undoubting trust, and the action of Messrs. Bowne and Shotwell was not such as to lead to any conclusion unfavorable either to their integrity or her capacity.

The will and codicil will be admitted to probate. There will be no award of costs to the caveators.